1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4   The Williams Companies,          )
                                     )
5            Plaintiff,              )
                                     )
6   vs.                             )   CASE NO. 4:25-CV-304-SEH-SH
                                     )
7   EQT Corporation,                 )
                                     )
8            Defendant.             )
    _____)

9

10

11

12

13            TRANSCRIPT OF PROCEEDINGS
                   JULY 1, 2025
14       BEFORE THE HONORABLE SARA E. HILL
              UNITED STATES DISTRICT JUDGE
15                 MOTION HEARING

16

17

18            A P P E A R A N C E S

19       STEVEN A. BROUSSARD and KEITH A. WILKES, Attorneys at Law,
    Hall Estill Attorneys at Law, 521 East 2nd Street, Suite 1200,
20   Tulsa, Oklahoma 74120-1855, appeared on behalf of the
    plaintiff.
21
         REBECCA D. BULLARD, Attorney at Law, Senior Counsel at
22   Williams, One Williams Center, P. O. Box 2400, Tulsa, Oklahoma
    74102-2400, appeared on behalf of the plaintiff.
23
         MR. GIDEON ANDREW LINCECUM, Attorney at Law, Steptoe &
24   Johnson, PLLC, Oklahoma Tower, 23rd Floor, 210 Park Avenue,
    Suite 2300, Oklahoma City, Oklahoma 73102, appeared on behalf
25   of the defendant.

                    U.S. DISTRICT COURT - NDOK
               REPORTED BY:  LESLIE K. RUIZ, OK-CSR, RMR

1  PROCEEDINGS:

2  ------------------------------------------------------------

3      **CSO:**  All rise.  The United States District Court for the

4  Northern District of Oklahoma is now in session.  Honorable

5  Sara Hill presiding.

6      **THE COURT:**  Please be seated.

7      **THE DEPUTY COURT CLERK:**  This is *The Williams Companies*

8  *versus EQT Corporation*, Case No. 25-cv-304-SEH-SH.

9      Counsel, please enter your appearances.

10     **MR. WILKES:**  Go ahead.

11     **MR. BROUSSARD:**  Steve Broussard and Keith Wilkes for the

12 plaintiff, Williams Company.  And also to my right is Becky

13 Bullard, who's also in-house counsel for Williams.

14     **THE COURT:**  Good morning.

15     **MR. LINCECUM:**  And Gideon Lincecum for EQT Corporation,

16 the defendant.

17     **THE COURT:**  And how do you say your last name again?  I'm

18 sorry.

19     **MR. LINCECUM:**  Yes, ma'am.  Lincecum.

20     **THE COURT:**  Lincecum?

21     **MR. LINCECUM:**  Yes, ma'am.

22     **THE COURT:**  And I'm sorry that everyone had to wait for

23 our very long criminal hearing, but that is my life, and so

24 today it is your life as well.

25     **MR. LINCECUM:**  Sure.

 1      **THE COURT:**  So I have read all the documents.  It strikes

 2  me that there were basically two fairly outstanding and what

 3  appear to be urgent matters going on.

 4      One of them is the motion to vacate that was filed by EQT

 5  and then, subsequent to that, got a motion from Williams

 6  requesting that I extend the TRO that was issued in the state

 7  court for some period of time until we can have the hearing on

 8  the preliminary injunction.  Does that sound like a fair state

 9  of where we're at right now?

10      **MR. WILKES:**  Yes, Your Honor.

11      **MR. LINCECUM:**  Yes.  Yes, Your Honor.

12      **THE COURT:**  So there are -- I appreciate, again, the

13  additional briefing on the jurisdictional issue.  That was one

14  of the two issues that I think are sort of the ones that are

15  most important to me at the moment.

16      One of them was making sure that if there was going to be

17  an extension of the TRO, that I had jurisdiction over the

18  defendant sufficient to issue such a continuing order.  And so

19  I -- I feel like I've gotten some -- some good argument on that

20  from the parties in the briefing.

21      And I'll just go ahead and imply for Williams the other

22  issue that I am particularly interested hearing about today is

23  both the damage and the harm to Williams and the circumstance

24  because, in order to extend it, I have to find you're likely to

25  succeed on the merits.  And one of the elements that you've got

1    to wrestle with here on your argument is whether -- what the

2    damage is that's been caused to Williams and then also what the

3    irreparable harm would be sufficient to justify issuance of the

4    TRO.

5        Those are the issues that I'm the most focused on here,

6    but I'm happy to hear from the parties anything else that you

7    think I need to know or anything that's happened in the last 12

8    hours or so since you filed your last document before the

9    Court.

10        I'll let -- think I'll let Williams go first.

11        **MR. WILKES:**  Okay.

12        **THE COURT:**  You're the plaintiffs here, in my mind, so

13    I'll let you all start and see if you can address some of these

14    issues for me.

15        **MR. WILKES:**  Thank you, Your Honor.  Keith Wilkes for the

16    Williams Companies.  One item that I'm not sure is contained

17    within the -- the briefing from the defendant is that

18    Defendant, acting as Plaintiff, filed a suit against Mr. Wingo

19    in the Western District of Pennsylvania and on Friday reque- --

20    filed a motion for an ex-parte TRO against Mr. Wingo.

21        Just for the Honor's -- your benefit, the -- while not a

22    party, Mr. Wingo is an interested party.  He's present today --

23        **MR. WINGO:**  Yes, sir.

24        **MR. WILKES:**  -- along with his attorney, Oklahoma

25    attorney, Sam Fulkerson.

1        Mr. Wingo is a resident of Oklahoma.

2        Would you like, Your Honor, for me to address the personal

3   jurisdiction issue being that was the predicate, of course,

4   that -- can't rule on extending of the amended TRO until you're

5   satisfied that there's jurisdiction?

6        **THE COURT:**  Yeah.  Certainly, you can address that.  I

7   did, of course, read what you filed and I did feel like it was

8   extremely helpful.

9        It seems like there's a relatively strong argument that

10  EQT has directed its activity toward Tulsa, toward -- toward

11  Williams here in Tulsa in the Northern District, but you're

12  welcome to address that a little bit.  Just keep in mind that

13  I've read what you filed.

14       **MR. WILKES:**  Thank you, Your Honor.  If only -- one of the

15  points that popped out in my mind and in the defendant's

16  briefing yesterday was the -- was the argument that there is --

17  that a cease-and-desist letter cannot be grounds for personal

18  jurisdiction and cited -- they cited, in principal, to a Fifth

19  Circuit unpublished decision, *Inmar Rx Solutions, Incorporated,*

20  *versus Devos*, 786 F.App 445 (5th Cir. 2019).

21       The Fifth Circuit in the *Inmar* case reasoned that the

22  cease-and-desist letter was insufficient, in part, because the

23  activity the defendant attempted to regulate wasn't in Texas

24  where the venue and jurisdiction was in question.  The

25  employment activity was outside of Texas which, again, was the

1   forum state.

2        The employee, a Louisiana resident, would have worked for

3   this company, performed his -- his job duties for his new

4   employer in Louisiana, Mississippi, Alabama, and Florida, in

5   the Gulf states.  So there was distinction in that regard.

6        Here, in contrast, EQT's cease-and-desist attempted to

7   regulate -- regulate employment activity of -- of Mr. Wingo's,

8   now an Oklahoma resident, in Tulsa at Williams' headquarters

9   and interfere with Williams' business and contractual

10  relationships in Oklahoma.

11       Not in the brief -- being there's not a response to their

12  brief filed yesterday, I wanted to bring the Court's attention

13  to the Tenth Circuit case of *Dudnikov versus Chalk & Vermillion*

14  *Fine Arts*.  It's cited in the brief for other purposes.  In --

15  I believe in one of our footnotes, there is an analogy to some

16  of the facts.  And that's at 514 F.3d 1063 (10th Cir. 2008).

17       Then Circuit Judge Gorsuch wrote the opinion.  A couple in

18  Colorado sold fabrics from their home on eBay Auctions.  One

19  product depicted a Betty Boop parody of a famous art image.

20  Defendants were owners of the rights to the famous images, saw

21  the plaintiffs' auction page, and reached out to eBay in

22  California and brought it to their attention and asked them to

23  cancel the auction.

24       The auction, of course, being in Colorado.  And then as

25  well the -- the defendant -- what turned out to be the

1    defendant, the party claiming a trademark infringement, sent

2    e-mails to the -- to the plaintiffs directing Plaintiffs --

3    threatening to file a lawsuit against them in federal court.

4         Before the defendants could carry out that threat,

5    Plaintiffs initiated the action in federal district court in

6    Colorado seeking a declaratory judgment that the prints did not

7    infringe.  Defendants responded with a motion to dismiss

8    attacking personal jurisdiction.  The defendants were in

9    Connecticut.

10        And the District Court granted that motion.  Judge Gorsuch

11   in the Tenth Circuit overturned.  The Court noted that the

12   Court generally considers, quote, "whether the nonresident

13   defendant purposefully directed its activities at the forum

14   state."

15        And that's at page 1071.  "Purposeful direction exists

16   where there is an intentional action expressly aimed at the

17   forum state with the knowledge that the brunt of the injury

18   would be felt there."

19        The Court decided -- the Appellate Court decided that the

20   parties in Connecticut, by reaching out to a third party in

21   another state to try to interfere with the business of the

22   Colorado residents and by threatening the Colorado residents

23   with litigation, that they opened themselves up for

24   jurisdiction.  And the Court found, "On these facts, we cannot

25   say that the exercise of jurisdiction would be either unfair or

1  unjust," at page 1082.

2       There are also more recent cases which support the fact

3  that communications threatening suit or proposed settlement can

4  be sufficient to establish personal jurisdiction.  In *Tremble*

5  *Incorporated verse PerDiemCo* -- and that's all in one word --

6  997 F.3d 1147 (Fed. Cir. 2021), "The minimum contacts or

7  purposeful availment test was satisfied as a defendant

8  exchanged multiple communications with Plaintiff in the forum,

9  which included accusations of -- of the plaintiff's wrongful

10  conduct."

11       The *Tremble* Court noted the Supreme Court case law

12  regarding personal jurisdiction, the nature and scope of the

13  communications, the fact that you do not have to be physically

14  present to -- and especially in our electronic age -- to cross

15  the state lines in meaningful activity.

16       And the -- the Court found that the e-mails from the

17  entity outside of the forum state can still be considered as

18  activities purposefully directed at residents of the forum

19  through a cease-and-desist.

20       This was followed up, again, by the Tenth -- by the

21  Federal Circuit in 2022 in *Apple Inc. versus Zipit Wireless*, 30

22  F.4th 1368.  And a District Court determined the exercise of

23  jurisdiction over *Zipit* would be unreasonable because *Zipit*'s

24  contact with California all related -- that was a District

25  Court -- to the attempted resolution of the status patents for

1    the purpose of warning of infringement.  So warning letters.

2        The Federal Circuit overturned it.  The Circuit noted as

3    now as "there is no general rule that demand letters can never

4    create specific personal jurisdiction."  Id. at 1377 (quoting

5    *Tremble*).

6        More recently in *Magnesium Machinery, LLC, versus Terves*,

7    2022 U.S. Dist. LEXIS 199423, in the Western District of

8    Oklahoma, November 2nd, 2022, the -- the Court relied upon

9    *Zipit* and noted that infringement letters can't be a contact

10    satisfying minimum contact step inquir- -- inquiry if the

11    letters are purposefully -- can be, pardon me, a contact

12    satisfying the minimum contact if the letters are purposefully

13    directed at the forum and the claims arise out of the -- or

14    relate to the letters.

15        And that's in citing *Zipit* at 1375-76.

16        And also, quote, "Bright-Line rule that cease-and-desist

17    letters cannot support minimum contacts for personal

18    jurisdictions don't exist*." Zipit* at 1376.

19        So that -- I wanted to touch upon that because that was an

20    issue raised in the briefing yesterday regarding whether a

21    cease-and-desist in settlement communications can -- can raise

22    to the level of establishing personal jurisdiction.  I would

23    also point out that this wasn't just a -- I'd say "a garden

24    variety cease-and-desist or a notice of rights."

25        I've drafted those letters before to a -- to a former

1    employee on behalf of a -- an employer and copied their new

2    employer, just -- just setting for- -- reminding you of, Here's

3    your contractual obligations that you -- you have to the

4    company that are ongoing, and provide a copy.

5        And the purpose of it is just to let the -- make sure the

6    employer also knows that, Hey, this -- your -- your new

7    employee is subject to certain restrictions under a previous

8    agreement that's still in place.

9        And that's the -- that's the -- that's that type of

10    letter.

11        Here, we take it a step further with the fact that

12    Defendant then threatened litigation against Williams and its

13    personnel for a sundry of alleged violations and then further

14    threatened to implement emergency -- emergency pro- -- or

15    initiate an emergency proceeding for the purpose of seeking a

16    temporary restraining order.

17        Then after that letter was then sent to Williams in

18    Oklahoma -- you know, that letter, again, is trying to tell

19    Mr. Wingo and Williams that he's not going to be allowed to

20    work in Oklahoma because of this agreement, and it's trying to

21    dictate Williams' business operations in -- and its contractual

22    relationship with Mr. Wingo.

23        That letter was followed up by -- with his Exhibit 2 to

24    our briefing yesterday, which was an e-mail correspondence from

25    general counsel for Defendant in Pennsylvania to general

1    counsel for Williams in Tulsa.  And it makes note that in light

2    of their continued business relationship between the companies,

3    between EQT and Williams, they wanted to write up settlement

4    negotiations.  Of course, this was offered pursuant to Rule

5    408(b), which allows the Court to consider it for their

6    purposes.

7        EQT is not a competitor of Williams.  EQT is a customer of

8    Williams.  And that's the ongoing business relationship that

9    exists.  The points that followed in that e-mail correspondence

10   to Oklahoma set forth the rules by which EQT would allow an

11   Oklahoma company to employ an Oklahoma resident and the scope

12   of that -- what that employment would be with respect to -- to

13   many issues.

14       Negotiations continued over the weekend and over the next

15   days through phone calls and e-mails.  The e-mails were

16   attached as Exhibits 3 and 4.  By the -- by -- by June 15th

17   or 16th, EQT had put a demand on Williams that it was to

18   accept the terms by 2:00 p.m. Eastern Time and that their

19   lawyers had a tight timeline that they were going to abide by

20   obviously, again, inferring litigation.

21       They've already threatened litigation, TROs, and suing

22   Williams and its entities.  That is when, shortly after

23   one o'clock Central Time, Williams took the initiative to seek

24   and obtain a temporary restraining order from the Tulsa County

25   District Court.

1    In that, the district court motion and the verification of

2    counsel, me, it outlined with respect to contacting the other

3    counsel that we were not aware of -- of EQT having legal

4    counsel who could attend and defend the TRO hearing.  The TRO

5    order that the court entered had a discrepancy, which said that

6    an effort had been made to contact EQT's attorneys.

7    But what the court had rule -- reviewed was the motion and

8    the verification, and entered the order.  As soon as this was

9    discovered the next morning, this was pointed out to the court,

10    and the court corrected it through an amended TRO.

11    The motion for the amended TRO pointed out the discrepancy

12    and that -- and the fact that the court reviewed the statement

13    of counsel, the verification of counsel regarding the issue,

14    and not being able to -- to have -- not being aware of EQT

15    counsel in Oklahoma being able to appear and defend.

16    Under the state law regarding temporary restraining

17    orders, counsel needs to verify the -- the attempt or not made

18    to contact opposing counsel.  So there -- there's nothing

19    unusual or -- or improper about the TRO or amended TRO being

20    entered.

21    Defense counsel has called this a miscar- -- disparaged, I

22    believe, Williams and counsel for Williams in its pleadings

23    with respect to some nefarious type of representation made to

24    the state court.  And that -- those type of disparagements are

25    not well taken.  Mr. Broussard and I both have well over 30

1   years of experience before these courts without anyone

2   attacking our credibility and our ethical standards.

3        There was no misrepresentation to the court.  It was a

4   scrivener's error.  It was corrected the next day to the

5   satisfaction of the District Court Judge Kelly Greenough.

6        Plaintiff -- Defendant, pardon me, did follow through with

7   its threat to initiate legal action on the 17th of June, but

8   did it against Mr. Wingo in the Western District of Oklahoma --

9   pardon me, Western District of Pennsylvania.  And, again, on

10  this most -- on -- on Friday, June 27th, filed a motion for

11  ex-parte TRO against Mr. Wingo and -- stating that they had not

12  been able to serve him yet with the complaint and summons.

13  Mr. Wingo was out of the country; so, hence, he was -- he was

14  not available until this weekend.

15       And he lives in Oklahoma.  So those are some of the points

16  with respect to the jurisdiction.

17       Plaintiff did not address the fair play and substantial

18  justice elements.  Once the Court's satisfied that special

19  personal jurisdiction can exist, that the contacts and the

20  actions that -- are intentional and -- and meet all of the

21  elements, the Court then has to still decide whether the -- the

22  notions of fair play and substantial justice should allow the

23  Court to -- for the jurisdiction to remain.

24       Plaintiff did not address that issue and the test involved

25  in either their motion to vacate or in yesterday's briefing.

1    we would say that that has, in fact, been waived by them.

2        Those elements are that the defendant would not be unduly

3    burdened by litigating in this forum.  In today's modern world,

4    it's -- it's actually rare forced to meet in person in a civil

5    matter before a judge.  Everything is done electronically.  We

6    have -- also have video conferences.

7        Defendant has retained Steptoe & Johnson located in

8    Oklahoma City to represent in this matter.  So in-person

9    proceedings, just as he's here today, can be handled by

10   Defendant's Oklahoma counsel.  And there is no other counsel

11   for the defendant who's entered an appearance from outside of

12   the -- the jurisdiction of Oklahoma.

13       The second element is Oklahoma possesses a strong interest

14   in resolving the dispute.  We have an Oklahoma-based

15   corporation, an Oklahoma resident, and the law at issue is

16   Oklahoma has an interest in preserving the strong public policy

17   of the state against restraint of trade through unlawful

18   noncompetition and non-solicitation agreements.  That's by

19   statute in Oklahoma Statute, Title 15, Section 219A.

20       The Oklahoma Supreme Court in the *Howard versus Nitro-Lift*

21   *Tech* case, 2011 OK 98, paragraph 20, further pronounced that it

22   was the legislature's -- or it was Legislature's pronouncement

23   that -- that 219A states the public policy of Oklahoma, and the

24   Supreme Court, in bold, within the opinion noted at 219A, that

25   the employee, quote, "shall be permitted to engage in the same

1   business as that conducted by the former employer or in a small

2   business as that conducted by the former employer as long as

3   the former employee does not directly solicit the sale of

4   goods, services, or a combination of goods and service from the

5   established customer."

6       The Supreme Court views the non-solicitation very

7   narrowly.  If you don't mirror that language, it's void, and

8   there's no blue penciling allowed.  Part B of 219A -- or part 2

9   of 219 notices that any agreement or contract or provision

10  that's counter to the first element "shall be void and

11  unenforceable."

12      So Oklahoma also has a strong interest in resolving this

13  dispute.  Oklahoma is one of only four states in the United

14  States that has this strict, absolute policy against

15  noncompetition agreements in this -- in between employer and

16  employee.  That's California, North Dakota, and Minnesota and

17  Oklahoma are -- are -- are the only ones.

18      Of course, previous administration through the federal

19  trade association tried to implement a nationwide ban, which

20  was then subject to, I believe, a Fifth Circuit order that

21  stopped it last year.

22      But it's, for lack of a better -- it's a big deal in

23  Oklahoma.  I -- I would venture to say that there's no judge,

24  state or federal court, in Oklahoma that's not aware that any

25  noncompete agreement between an employer/employee is absolutely

1  void in Oklahoma; hence, the interests as well of Oklahoma law.

2      Williams will receive more convenient relief in Oklahoma.

3  Litigating in Williams' home state would be more convenient

4  than litigating elsewhere.  The site for the dispute involves

5  an Oklahoma empl- -- company, Oklahoma activities, and Oklahoma

6  law.  And witnesses for Williams would be in Oklahoma.

7      Exercising jurisdiction would lead to the most efficient

8  resolution of the controversy.  It says, "Key to this inquiry

9  are the location of witnesses."

10      Again, that's Oklahoma.  And that's *OMI Holdings*, 149 F.3d

11  at 1097.  Witnesses are located here, and Oklahoma law governs

12  the diversity action.  At the core of Williams' request, Your

13  Honor, for injunctive and declaratory relief is the fact that

14  Oklahoma public policy declared through legislative mandate

15  prohibits the noncompete.

16      The shared interest of the several states favors Williams,

17  is the last element of the fair play and substantial justice

18  argument or -- or review by the Courts.  "Under Tenth Circuit

19  authority, this factor weighs in favor of the plaintiff where

20  the defendant has not identified how the litigation of this

21  action in the defendant's preferred forum would advance any

22  fundamental substantial social policy."

23      That's *Employers Mutual Casualty Company versus* --

24      **THE REPORTER:**  I'm sorry; could you read a tad bit slower?

25      **MR. WILKES:**  I'm sorry, ma'am.

1        THE REPORTER:  It's okay.

2        MR. WILKES:  You know, *Employers Mutual Casualty Company*

3    *versus Bartile -- Bartile*, B-a-r-t-i-l-e, *Roofs, Incorporated*,

4    618 F.3d 1153, 1164 (10th Cir. 2010).  "No such identification

5    has been made by the defendant.  This factor, as with the other

6    four, favors Williams."

7        So, again, we believe fair and sub- -- play and

8    substantial justice argument has been waived for failure to

9    address it in the briefing.  And even if you do go through

10   the -- the elements, they favor fair play and substantial

11   justice being afforded to the defendant, for the Court finding

12   specific personal jurisdiction over it.

13       With respect to the personal jurisdiction, is there any

14   other issue that you would like me to address, Your Honor?

15       THE COURT:  No.  I -- I don't think so.  It was the --

16       MR. WILKES:  Okay.

17       THE COURT:  -- the *Dudnikov* case that I thought was among

18   the more interesting ones, that are the most analogous ones

19   that were presented to me through both of the briefings.

20       I, you know, gained some clarity on, I think -- just so

21   that we all understand when we're talking about what are the

22   actions that the defendant -- that you're alleging that the

23   defendant directed toward, you know, this state and toward your

24   client are this cease-and-desist letter, which was addressed to

25   Mr. Wingo but was directed to both Williams and to Mr. Wingo

1    and mentions both parties, and then there were a number of

2    follow-up e-mails and text messages, which were all submitted

3    as exhibits.

4        And those are the -- the -- the factual basis upon which

5    you're saying --

6        MR. WILKES:  Yes, ma'am.

7        THE COURT:  -- that it was directed at Oklahoma and

8    there's --

9        MR. WILKES:  Yes.

10       THE COURT:  -- nothing else floating around out there that

11   I haven't mentioned that you would say were the actions of EQT

12   that were directed at your client or at Oklahoma in this case?

13       MR. WILKES:  Well, that's specifically set through --

14   through exhibit, but as discussed in exhibit -- well, referred

15   to in Exhibit 2, the e-mail between general counsel to general

16   counsel at Williams notes that the -- that that is being sent

17   in -- in the consideration of the ongoing business relationship

18   between those two entities.

19       Everyone knows the Williams Companies is in Tulsa.  They

20   have an ongoing business relationship that is a customer of the

21   Williams Companies.

22       So you send the Williams Companies threats, you've

23   threatened to take them to court, you tell them how they're

24   supposed to operate with respect to their own employees and

25   Oklahoma residents in violation of a law, you should be

1  expected to be hailed into court under *world-wide Volkswagen*

2  vernacular.

3          **THE COURT:**  Okay.

4          **MR. WILKES:**  With respect to the -- the motion for

5  expedited order, in obtaining the initial TRO and then the

6  amended TRO, we were provided with a July 8th, 2025, hearing

7  on our motion for preliminary injunction that was filed in the

8  state court.  The -- the defendant removed the action here

9  making the preliminary hearing motion -- or the hearing date

10  moot.

11          Under Federal Rule 65, an ex-parte temporary restraining

12  order can only last for 14 days.  Under the U.S. Supreme Court

13  authority I cited within my motion, that -- that is based --

14  the -- the 14 days starts from the time of removal.

15          Well, that's also the same day that we were -- we got the

16  amended TRO -- TRO, so on June 18th.  So it's a wash.  Judge

17  Greenough was on vacation -- going on vacation -- I believe's

18  on vacation now; hence, the July 8th setting.

19          The removal on the 18th started the 14-day clock under

20  Federal Rule 65, which brought us -- brings us to tomorrow for

21  the expiration.  We have moved for the -- the setting of the

22  preliminary injunction hearing.  I know we had communications

23  with your courtroom deputy about dates.  I think a date was

24  proposed for the 3rd, in which the defense counsel were -- or

25  plaintiff counsel were not available.

1    Chiefly, I -- I'm -- I'm the municipal judge of the City

2    of Claremore, and I hold my docket on Thursdays.  There are

3    very often people who are in custody that are brought over from

4    the Rogers County Jail for their initial appearance.  And that

5    time, whether they get to continue to spend the next week in

6    jail, is up to me.  I -- so --

7        **THE COURT:**  Well, we don't want a general uprise --

8        **MR. WILKES:**  -- due --

9        **THE COURT:**  -- in counsel or in Claremore.

10    That would be inconvenient for everyone.

11        **MR. WILKES:**  Right.  Right.  So -- so, anyhow, defense

12    counsel, later that evening, came back and said that -- that

13    the 3rd worked for them and they -- and the Court shouldn't

14    even have the hearing.

15    But the -- the date that the courtroom deputy proposed

16    'cause I said, "We're available the entire next week," and --

17    and it's a trial week.  The -- and the next available was the

18    14th, and then we said, "We're available the 14th."

19    Of course, this runs into the problem, is we have an

20    expiring TRO that expires tomorrow; hence, seeking the

21    extension.  Under Rule 65, the Federal Rules of Civil

22    Procedure, for good cause shown, the Court can extend an

23    ex-parte TRO for -- I believe language says for a like term, so

24    another 14 days.

25    That would take us to July 16th.  The thought being --

1    being the courtroom deputy had offered potentially July 14th

2    as a hearing on the preliminary injunction and that that --

3    that would work.  We had an -- we had a hearing date, and

4    the -- the TRO would have been in existence until the hearing

5    date, the removal fully within their rights, but it upended

6    that and -- and took away that hearing on preliminary

7    injunction as -- as such.

8         We believe that an extension of the -- of the TRO should

9    be necessary or is -- there is good cause to -- to extend it.

10   The -- we briefed and showed good cause for the entry of the

11   initial TRO.  And what we face is, of course, now, there's a --

12   a potential TRO hearing that's going to take place in the

13   Western District of Pennsylvania.

14        Before I left my office this morning, I noted that it

15   still had not been set, but there's the outstanding motion for

16   ex-parte TRO that Plaintiffs in that case, Defendants here,

17   would like to replace our TRO, which would prevent Mr. Wingo

18   from working in Oklahoma 'cause they're pushing Pennsylvania

19   law, so -- but that's completely the public policy of Oklahoma.

20   It's off- -- this -- that whole notion -- it's offensive.

21        So there's immediate irreparable harm that will take place

22   if the amended TRO is not extended until this Court can

23   consider the merits of the preliminary injunction motion.

24   We -- we face the challenge of the possibility of a

25   Pennsylvania Court entering a TRO that will impact an Oklahoma

1  corporation and an Oklahoma resident and an Oklahoma resident

2  working in Oklahoma for the Oklahoma corporation.

3      So that's an immediate issue.  We'll be damaged if that's

4  allowed.  If Mr. Wingo is not allowed to work for the Williams

5  Company, that -- he -- it's -- it's one of the highest level

6  positions in the company.  It only became vacant because the

7  previous occupant became, today, the president and the CEO

8  of -- of the Williams Companies.  So it's high up there.

9      The -- the process for finding a -- doing -- conducting a

10 nationwide search for candidates and narrowing that down and

11 then interviewing and reinterviewing -- and that is a lengthy

12 one.  That position -- that key position would be left vacant

13 for an undetermined period of time until such time as either a

14 new candidate could be filed or Mr. Wingo -- the restrictive

15 covenant in Pensnsyl- -- according to the Pennsylvania Court,

16 until it could expire.

17     And so there is immediate and -- threat of irreparable

18 harm.  We absolutely believe we can prevail on the merits of

19 this case.  Oklahoma law applies.  There is no doubt that the

20 restrictive noncompete -- restrictive covenants of noncompete

21 and that non-solicitation, as worded, violate the public policy

22 of Oklahoma.

23     We will prevail.

24     **THE COURT:**  Well, let me -- I need to ask you some

25 questions about this that --

1        **MR. WILKES:**  Sure.

2        **THE COURT:**  -- that strike me.

3        One of them is, is that although I'm sure it is both a

4   lengthy, cumbersome, and expensive process to select a CEO

5   and -- or not a CEO, an executive vice president -- that

6   doesn't mean that it's a -- something that you couldn't put a

7   number on, the investment that you've made and --

8        **MR. WILKES:**  I --

9        **THE COURT:**  And so I have a few questions.  I'll let you

10  address them in the order that you want to.

11       **MR. WILKES:**  Sure.

12       **THE COURT:**  And so whether or not a -- the standard is not

13  whether Williams would be mightily inconvenienced by, but

14  whether it would suffer irreparable harm.  And so if it's

15  something that we can put a number on and say, "This would be

16  the amount of damages that we would suffer," well, then that's

17  what your lawsuit's for, right, to get --

18       **MR. WILKES:**  Sure.

19       **THE COURT:**  -- get that out of EQT's hide when it comes

20  down to it.

21       So help me understand why this is irreparable and why it's

22  not just mightily inconvenient.

23       **MR. WILKES:**  It -- it --

24       **THE COURT:**  And then the second thing that I would like

25  you to address is this issue of, you know, what's before this

1    Court.  The contract dispute between Mr. Wingo and EQT is not

2    before this Court.

3        I have a tortious interference case that you have filed

4    against EQT, so it's between those two parties.  I don't --

5    Mr. Wingo's rights, as you are -- as you are putting it forward

6    to me, his rights would be mightily affected by what this Court

7    does, but he's not a party to this case.  He's --

8        **MR. WILKES:**  Certainly.

9        **THE COURT:**  He's a stranger to this action.  We also have

10   another action that appears to be proceeding with that in

11   the -- with the TRO providing it no real problem in

12   Pennsylvania; that that case is moving forward in that

13   jurisdiction.  And so I'd like you to address both of those

14   issues if you would.

15       **MR. WILKES:**  Thank you, Your Honor.  Be happy to.

16       The reengaging in the lengthy nationwide search and that

17   entire hiring process, it's not the monetary cost of engaging a

18   third party to find suitable candidates.  It's -- I don't think

19   you can put a money -- of course, you could put if --

20   Mr. Wingo's not a party.  So any salary or moneys that he would

21   make from Will- -- from this -- from Williams, that, of course,

22   has a dollar figure.

23       This is a -- the -- the nation's largest gas line holder

24   and the -- the largest, by monetary considerations, corporation

25   in Oklahoma.  Having that position, who has immense

1    responsibilities throughout the company, being unfilled for an

2    extended period of time, you cannot put a dollar value on it.

3         That's -- that's -- hence, the -- the impetus for seeking

4    injunctive relief is there -- we can't put a money -- dollar --

5    a dollar value on the impact on the Williams Companies during

6    that process.  Well, seeing if it can -- it's just not -- it's

7    not an area that can be monetized in our view, Your Honor, the

8    impact on the Williams Companies.

9         Yes, what is before this Court is the defendant's tortious

10   interference with contact -- contractual and business relations

11   of the Williams Companies with Mr. Wingo.  And so it's --

12   Mr. Wingo, again, is an interested party but, obviously, not a

13   party.

14        But the issue here:  Is there threatened immediate

15   threats -- an immediate threat to sue the Williams Companies

16   and its personnel and to initiate an emergency proceeding to

17   seek a temporary restraining order, and then giving the

18   Williams Company a 2:00 p.m. Eastern deadline in which to

19   accept its demands and the demands of which would control how

20   Williams operates its business in Oklahoma?

21        That -- that is what's before this Court.  The -- the

22   issues regarding Mr. Wingo and EQT, they -- they are -- that

23   has been filed subsequent to this action.  We have a TRO in

24   place and a TRO that's in place that controls, we believe.  And

25   the center of this dispute with respect to the Williams

1    Companies and EQT is absolutely in Oklahoma in the forum state.

2        I've made reference to -- to Mr. Wingo as an Oklahoma

3    resident because that, again, goes to the public policy

4    argument that the -- the importance of this to the state of

5    Oklahoma to protect its public policy is being -- was being

6    threatened and in- -- and threatened to be infringed upon by

7    the defendant; hence, the --

8        **THE COURT:** Well, let me ask you sort of how that --

9        **MR. WILKES:** Yes, ma'am.

10        **THE COURT:** -- how that would work.

11        So, you know, you've identified, and, well, the Court's

12    familiar with, the public policy of the state of Oklahoma --

13        **MR. WILKES:** Yeah.

14        **THE COURT:** -- as it relates to that.

15        So I've got this agreement that was entered into between

16    Mr. Wingo and EQT and so, you know, your -- I think it's your

17    supposition to me that if I examined that agreement under

18    Oklahoma law, that I would determine that those provisions are

19    too broad and inconsistent with Oklahoma public policy and,

20    therefore, are void --

21        **MR. WILKES:** Yes.

22        **THE COURT:** -- as it relates to -- as it relates to these

23    two individuals, that --

24        **MR. WILKES:** Yes, ma'am.

25        **THE COURT:** That Mr. Wingo has no more duty to EQT under

1  these two different provisions that you've identified?

2       **MR. WILKES:**  Correct.

3       **THE COURT:**  Right?  But he's not a party to this agreement

4  at all and, I mean, he's not a party to this lawsuit where I'm

5  determining the rights underneath that -- underneath that.

6       And, also, if I'm looking at that agreement, don't I have

7  to look at the entirety of the agreement between EQT and

8  between Mr. Wingo, which would include things like the forum

9  selection clause that are part of that agreement instead of

10  just looking at the two clauses that you identified as void as

11  it relates to Oklahoma's overriding public policy?

12       **MR. WILKES:**  Oklahoma -- the Williams Company is not a

13  party to that contract and did not agree to any choice of law

14  or choice of venue with EQT Corporation.  The -- the proper

15  venue and -- and specific personal jurisdiction is proper here

16  before the Court based upon EQT's conduct.

17       The -- the fight is between the Williams Company and EQT

18  regarding its attempt to interfere with the contractual

19  relations in Oklahoma, the -- that is an underlying contract.

20  As between Mr. Wingo and EQT in Pennsylvania, that's a

21  different story with respect to the choice of for- -- of venue

22  and choice of law.

23       It doesn't apply to the Williams Company here.  The TRO

24  orders that were -- that were entered, Your Honor, it says the

25  defendant shall be restrained and enjoined from enforcing its

1    noncompete, non-solicitation agreement in Oklahoma against

2    Robert Wingo.  I understand your distinction there.

3         Plaintiff is authorized to continue its contractual

4    employment relation with Mr. Wingo in Oklahoma without

5    interference by the defendant.  And EQT is immediately strained

6    [sic] and enjoined from enforcing its noncompete,

7    non-solicitation, and the plaintiff is authorized to continue

8    its contractual relations.

9         And so it's -- it's convoluted in the sense that we

10   have -- Mr. Wingo is -- is not a party here, but he's --

11   wasn't a -- he wasn't a necessary party.  The -- the threats

12   that we took issue -- and we kind of go back to the Dabinov --

13   or *Dudnikov* case from the Tenth Circuit and pretty much a

14   but-for activity.

15        But for EQT's conduct in threatening to sue the Williams

16   Company and its personnel for a variety of -- of alleged wrongs

17   and its threat to seek emergency relief in a TRO and giving a

18   hard deadline -- an arbitrary hard deadline, but for those

19   activities, we wouldn't be here.  It -- it's -- Williams has

20   its rights, and they're separate from Mr. Wingo's.

21        And those rights have been threatened by the plaintiff --

22        **THE COURT:**  And I'm inclined to --

23        **MR. WILKES:**  -- by the defendant; pardon me.

24        **THE COURT:**  Sorry.  And I'm inclined to agree with you on

25   the personal jurisdiction matter.  So going -- just one final,

1  I think, thing that I'm -- helps me try to think through what

2  we're trying to do here.  Going to the elements on your

3  tortious interference claim; right?

4      **MR. WILKES:**  Okay.

5      **THE COURT:**  So part of the determination is, are you

6  likely to -- substantially likely to prevail on the merits?

7      **MR. WILKES:**  Right.

8      **THE COURT:**  You know, the second element here is that the

9  interference was malicious and wrongful and neither justified,

10  privileged, nor excusable.

11      And do you think under that section that -- that the other

12  terms of the agreement between Mr. Wingo and Mr. -- and EQT

13  might be relevant in terms of whether or not -- I mean,

14  assuming, for the sake of argument, that they did interfere

15  with the existence of an employment contract between Williams

16  and Mr. Wingo and in determining and making the case that that

17  interference was malicious or wrongful, is the existence of the

18  other terms of that agreement, that severance agreement between

19  the parties, is that relevant to that consideration?

20      **MR. WILKES:**  Of -- with respect to the choice of venue and

21  choice of law of -- again, I -- I don't think so, respectfully,

22  Your Honor, that that -- that's the contract -- that is a

23  contract between Mr. Wingo and Williams -- or, pardon me, and

24  EQT.  But EQT was trying to enforce this contract in Oklahoma,

25  where it's absolutely against the public policy of the state.

 1          And so that -- those are the key provisions.  Is this a

 2    non- -- is this a noncompetition section and a non-solicitation

 3    section that violate the public policy of -- of Oklahoma?  EQT

 4    was threatening litigation and bringing it all into question

 5    against the Williams Company here and trying to control the

 6    Williams Companies' business operations here.

 7          I know I'm going back to the personal jurisdiction but

 8    I -- I believe they -- that they blend together on whether it

 9    was a -- whether they're wrongfully seeking to impose and

10    interfere with Williams' business and contractual relations in

11    Oklahoma by trying to push a contract that has provisions that

12    are absolutely violative of Oklahoma public policy and void.

13          THE COURT:  Okay.  Feel like I had one more question, but

14    I've lost it since you were speaking.  Sorry.  This is why I

15    have to interrupt sometimes if it's in my thoughts.  All right.

16    I think that -- those are the questions that I had for you.

17          MR. WILKES:  Thank you, Your Honor.

18          THE COURT:  Thank you.

19          Lince- -- Lincecum?

20          MR. LINCECUM:  Lincecum.

21          THE COURT:  Lincecum.

22          MR. LINCECUM:  Yes, Your Honor.  Thank you.  Gideon

23    Lincecum for the defendant, EQT Corporation.

24          Your Honor, I somewhat felt the same way as you did after

25    reading the brief that the plaintiff filed, but I remembered

1    something that I -- some very wise advice that I had received

2    and have passed it on many times.  It was, like, "when you get

3    a brief, go pull every case and read it."

4        And so when I was looking at the plaintiff's brief, it was

5    on page 6 -- starts on page 6, goes into page 7.  They put in

6    bold print "intentional conduct targets and has substantial

7    harmful effects in the forum state."

8        And the question that came to my mind were, okay, so what

9    activities are they talking about 'cause they keep referring to

10   these intentional acts?  So personal jurisdiction, when you're

11   getting to specific jurisdiction, looks at those acts.  And you

12   heard counsel state that they, essentially, misapplied the

13   but-for causation.

14       Said that but for EQT's cease-and-desist letter and

15   settlement negotiations and discussions that proceeded after

16   that -- you heard him refer to the 408 conversations -- that

17   those -- that was the capsule that constituted why we're here,

18   those activities.

19       EQT does not, as we've briefed, have any connection to

20   this state, to the state of Oklahoma.  And so as I looked at

21   that and I considered, you know, what does the law say, I first

22   pulled the case that they cited.  It was *Old Republic*.  I want

23   to make sure I don't get out of order here on my cases.

24       And I was, like, Okay.  So let's look at *Old Republic* and

25   that also -- and I always say the name wrong too.  With my last

1    name, I can get away with it, occasionally.  Du- -- *Dudnikov.*

2    It's probably *Dudnikov.*  Say it a little faster, we'll get it.

3    It also relates to that case as well.

4         But one of the key things that I noticed about that case,

5    the *Old Republic* case, and it starts on about 907.  The case

6    cite's in the brief but, just for the record, it's 877 F.3d

7    895.

8         Something that struck me when it got to the part of

9    looking at the -- the activities, the conduct, it said that --

10   it was quoting *Walden*, which is another very influential case

11   that we -- we quoted that outlines all of these criterias,

12   these tests.  They're well established.  They're well known

13   what we have to look at.  It says, "The plaintiff cannot be the

14   only link between the defendant and the forum."

15        So then you get to look at, okay, if -- how does that

16   shape up here?  We, essentially, have -- and the -- the Court

17   also in *Dudnikov* went off and -- went on and looked at -- let

18   me make sure I'm -- yeah, looked at the instances to make sure

19   it wasn't just the unilateral acts of the party, the plaintiff,

20   that brought the case to the forum.

21        And one of those specific items, it starts on page 1074 of

22   the *Dudnikov,* 514 F.3d 1063, said "Unilateral acts which would

23   not confer with personal jurisdiction occur in two flavors.

24   The first one is when a purchase of a product in one forum is

25   carried into another forum.  The second is when the unilateral

1  activity appears where the defendant has purposefully directed

2  its activities at the forum, but the plaintiff's injury

3  nonetheless arises out of the plaintiff's or a third-party's

4  unilateral acts rather than the defendant's."

5      And so as I tried to discern exactly who's the actor --

6  and -- and you heard counsel say, "Well, EQT's the actor."

7      The thing that struck me the most was -- in their citing

8  *world-wide volkswagen* was that what the fact patterns

9  demonstrates here seems to be undisputed, is that we have a

10 well-established Oklahoma and recognized Oklahoma corporation

11 that left the state of Oklahoma and went to Texas and hired a

12 Texas citizen.

13     And then as part of that, they brought the good back.

14 They brought the citizen back into the forum.  And then when

15 EQT advised the citizen, the -- the employee that it had a

16 contract with that was controlled by the venue and the choice

17 of laws controlled by Pennsylvania, when they sent him a letter

18 and said, "You can't do that, you have this contract with us,"

19 and they copied Williams, Williams says, "Aha, we got a

20 cease-and-desist letter.  That might get us there to create --

21 to bring them into Oklahoma as a contact."

22     And then as they had engaged in these additional

23 conversations with the settlement discussions, Williams said,

24 "Aha, step 2, maybe we can get there if what these -- with

25 these additional conversations about settlement."

1        And that's where things, then, stop because, given that

2    that's the only contacts, those contacts don't exist but for --

3    and this is where I believe the test actually applies -- but

4    for the unilateral actions of Williams when they left the state

5    to go get a Texas employee that was our employee that was

6    subject to a contract with us controlled by Pennsylvania law.

7        There's no dispute that those -- that contract is

8    controlled there.  And, in fact, the lawsuit that was

9    provide -- that was filed there was authorized that the -- that

10   EQT could seek injunctive relief.  So there's no misdoing.

11   There's no wrongdoing in seeking that injunctive relief.  It

12   was authorized between Wingo and EQT pursuant to that

13   agreement.

14       In addition to that, there's -- you know, as part of that,

15   there is a -- a clause requiring arbitration, so you -- you

16   throw that into the mix when you're considering the contract.

17   And there's been law that said you cannot -- you know, I'll get

18   to that later -- but Oklahoma law cannot be substituted in

19   arbitration.  The arbitrator has to be able to apply the law of

20   the contract.

21       So we -- we -- we've got this situation that stands where

22   Williams went and bought a good in Texas and now wants to

23   subject EQT to personal jurisdiction in Oklahoma.

24       **THE COURT:**  I don't know if you should call Mr. Wingo a

25   good, but...

1    **MR. LINCECUM:** Well, I know.

2    **THE COURT:** But let's start with -- I just wanted to try

3    to keep the personal jurisdictions argument separate from the

4    contractual --

5    **MR. LINCECUM:** Right.

6    **THE COURT:** -- snarls that we'll get into in a minute.

7    **MR. LINCECUM:** Right.

8    **THE COURT:** But would you agree that, you know, the

9    e-mail -- and I -- we'll -- we'll talk for a minute about what

10   it means.  But we will at least -- or can we at least agree

11   that EQT directed an e-mail to Williams?  I mean, you -- it

12   happened intentionally.

13       And I'm not saying with the purpose of creating

14   jurisdiction, but it -- but EQT purposefully sent a e-mail to

15   Williams regarding its concerns about the proposed

16   relationship -- employment relationship between Mr. Wingo and

17   Williams?

18   **MR. LINCECUM:** Right.

19   **THE COURT:** Okay.

20   **MR. LINCECUM:** The -- the -- those communications, like I

21   mentioned earlier, the cease-and-desist letter that they

22   received a copy of, although it was directed to Mr. Wingo, and

23   then the second set of communications where this conversation

24   and text messages, they did exchange --

25   **THE COURT:** Okay.

1          **MR. LINCECUM:**  -- those communication.

2          That -- those facts happened.

3          **THE COURT:**  Right.

4          **MR. LINCECUM:**  The --

5          **THE COURT:**  But your argument, as I understand it, is that

6     those were -- they were intentional by EQT, that the sending of

7     the e-mails and the letter and the text messages were

8     intentional, but that those only happened because Williams

9     hired your employee from Texas and then have since made him --

10    he has become an Oklahoma resident, and that he has come to

11    Oklahoma because of their actions and that means that your --

12         **MR. LINCECUM:**  They --

13         **THE COURT:**  It's not -- they don't have -- that this Court

14    doesn't have jurisdiction over you.  That's the argument that

15    you're making here today?

16         **MR. LINCECUM:**  Correct.

17         **THE COURT:**  Okay.

18         **MR. LINCECUM:**  And -- and you're right.  The "goods"

19    reference to Mr. Wingo -- unfortunately, long time ago when

20    they started cause -- calling human resource, human resource, I

21    felt a little jilted 'cause I was like, Now, we've just been

22    a -- made a widget in a sense.

23         But, essentially, they bought a human resource in Texas

24    and brought him back to Oklahoma.  And so, now, not being a

25    party to the -- that agreement, Williams files a lawsuit.  And

1    then they -- there's -- at that point, there's never an

2    opportunity for EQT to come in and inform the state court that

3    there is no personal jurisdiction because if you just stop at

4    the cease-and-desist letters -- and the federal courts and the

5    Tenth Circuit and the U.S. Supreme Court don't stop there.

6        It matters not what EQT did.  It matters why they did it.

7    And here, it wasn't that EQT was irrespective of Plaintiff

8    directing their actions to the state of Oklahoma, which

9    would -- availed them of the laws of the state of Oklahoma,

10   they were responding to what Williams did out of the state.

11       So in that situation -- and that's why -- and I'll get to

12   the cases that -- that -- one particular, the *Red Wing* case

13   that's cited in *Dudnikov*.  That's why this case is different,

14   and you can't just stop at those -- those cease-and-desist

15   letters and subsequent conversations.  The Courts unanimously

16   hold that's not enough.  There has to be more of an -- an

17   affirmative act to the forum.

18       For example, with the case with Shirley Jones, *Calder v.*

19   *Jones*, Shirley Jones was an actress that lived in California.

20   You -- you've -- I don't have to go through the facts, but the

21   writers were hauled into California because they said they

22   directed their activities there.  The Court found that that

23   affirmative act of directing and writing that article for, you

24   know, the -- the newspaper that was published there, that was

25   the affirmative act.  So there was something else.

1    And then you get to the case -- I'm trying to remember the

2    one, but involved the e -- eBay, where the actor there first

3    shut down the auction, the eBay auction, and then followed up

4    with a cease-and-desist letter.  There, you had an affirmative

5    action that was -- that met the minimum contacts test because

6    the Tenth Circuit in -- in later cases, and all the other ones

7    have found, that cease-and-desist alone is not enough.

8    And you heard counsel here, the cease-and-desist letter

9    and the conversations about the settlement, that's all they

10    have.

11    **THE COURT:**  I think that you -- that you would agree --

12    although maybe not -- I think you would agree that the purpose

13    that EQT had in sending those letters was to prevent Williams

14    from employing Mr. Wingo in the capacity that it -- that it

15    intended to.  Like, it was -- that you were making them aware

16    that if they intended to follow through with this, that you

17    would -- that EQT would take steps to prohibit that in court or

18    otherwise.  Is that a fair assessment --

19    **MR. LINCECUM:**  I --

20    **THE COURT:**  -- of your intent?

21    **MR. LINCECUM:**  I -- I would love to agree with Your Honor,

22    but I can't because I want to make sure that -- that I'm -- I'm

23    explaining it correctly, as far as my position.

24    **THE COURT:**  Sure.

25    **MR. LINCECUM:**  The communication to Williams was that --

1    essentially, that EQT intended to force its -- its contrac- --

2    its contract against Wingo and that, in doing so, that if

3    Wingo -- or Williams was to interfere with that, then they

4    would, at that point, become subject to the tort of tortious

5    interference with their contract.

6         So the communication that was coming to Williams was that,

7    "Hey, just like in the infringement cases with the

8    cease-and-desist letters, we have an agreement.  We have a

9    protected, protectable legal right, and you're interfering with

10   it."

11        That notice is not enough to confer minimum contacts even

12   if we're just focused on the forum state.  But here, we have

13   where Williams actually, again, left the state and brought the

14   human resource back to Oklahoma.

15        And so, in that situation, there -- there's been no

16   affirmative act by EQT directed at the forum state other than

17   the conversation where Williams was advised that, one, EQT had

18   a protectable right -- legal right in the contract in its

19   employment relationship with Wingo that it intended to enforce

20   and, basically, gave them notice that if they acted to

21   interfere, that that could and would be dealt with as

22   potentially an intentional tort.

23        That's informing them of their rights.  EQT is informing

24   Williams these are -- it's telling them, as they sit in

25   Oklahoma, these are our rights that exist outside this state.

1  Williams has a problem.  And that problem is they're trying to

2  now get the Court to stop just at those cease-and-desist

3  letters, those conversations, again, although they were created

4  by their own unilateral acts.

5      And the Court -- and they don't tell you that in the

6  brief.  You have to actually look into the cases.  One

7  particular -- I think I can just cut to the chase.

8      If you look at, for example -- oh, let's see, my

9  apologies.  I had them lined up and then I started pulling it

10 out.  Here it is.  It is the case that -- it's *C5 Med. Werks*

11 *versus CeramTec Gmbh*.  It's a Tenth Circuit Court of Appeals

12 case in 2019.  It's 937 F.3d 1319.  And, let's see, it starts

13 right after 13 -- page 1323.

14     It says -- actually, let me -- let me progress.  I was

15 trying to cut to the -- the good chase part.  It comes down

16 to -- it's still in 1324.  It says, "Nor is CeramTec's

17 cease-and-desist letter a proper basis for jurisdiction.

18 First, we agree with the Federal Circuit that a single

19 assist -- cease-and-desist letter is insufficient to confer

20 jurisdiction in a declaratory judgment action like this one."

21     And that's what we have here is a declaratory judgment

22 action where they're seeking to declare the contractual

23 provision in a contract they're not party to void under a

24 foreign state's laws.  So the law says that it's not enough.

25     And, then, if you back up, for example, to *Red Wing Shoe*,

1    which is a case cited in *Dudnikov*, and it is 148 F.3d 1355, and

2    you read around 1360 through 1361, the Court makes it very

3    clear that -- and I, in -- in reading -- now, this is a case

4    that -- from 1998, so the Tenth Circuit's moved a little

5    further in the case law saying cease-and-desist letters are not

6    enough.

7        The Court explains.  It says, "Thus, even though

8    cease-and-desist letters alone are often substantially related

9    to the cause of action" -- and he puts in paren -- "(thus

10   providing minimum contacts), the "minimum requirements inherent

11   in the concept of 'fair play and substantial justice'... defeat

12   the reasonableness of jurisdiction."

13       So even if -- and the Tenth Circuit has moved away from

14   even considering that minimum contact as far as a

15   cease-and-desist letter being enough -- enough.  Even if you

16   assume that, you don't get there because the Tenth Circuit has

17   said it doesn't work.

18       It doesn't get past the reasonableness of the

19   jurisdictions.  And then it also goes on to say -- 'cause in

20   that case, they were talking about, "Well, there were other

21   discussions like settlement discussions."

22       And, in -- in fact, it was offer for settlement of the

23   disputed claim, as here.  It said, "Treating such hybrid

24   cease-and-desist letters differently would allow -- would also

25   be contrary to fair play and substantial justice by providing

1    disincentives for the initiation of settlement negotiations."

2        And then it continued.  This is the *Red Wing* case.  Says,

3    "As this Court has stated before, cease-and-desist letters

4    alone do not suffice to justify personal jurisdiction.

5    Specifically, such letters cannot satisfy the second prong of

6    the Due Process inquiry.  Standards of fairness demand that --

7    here that HHI be insulated from personal jurisdiction in a

8    distant foreign forum when its only contacts with a forum were

9    efforts to give proper notice of its patent rights.  HHI's

10   three letters alone do not create personal jurisdiction in

11   Minnesota."

12       THE COURT:  Don't you agree that all of these cases are

13   going to be pretty fact specific?

14       MR. LINCECUM:  They -- they are fact specific only in the

15   context, and that's -- that's what I struggle with.  I was,

16   like, Okay.  Let's -- let's see if these are just -- you know,

17   just -- they're just random facts running all over the place.

18       The consistency that I found was that they involved

19   cease-and-desist letters and then another conversation, like

20   offers of settlement, but they also had another part to it.

21   Was the affirmative acts directed at the forum state?  Here, we

22   don't have that.  We don't have those affirmative acts.

23       THE COURT:  So and just to be sure that I'm -- I'm

24   characterizing in my own mind what you're saying here properly.

25   You described the letter that was sent as sort of an

1    advisement-of-rights letter, not -- not a letter where EQT was

2    advising William of any consequences for their employment of

3    Mr. Wingo.

4        **MR. LINCECUM:**  The -- the letter was directed to

5    Mr. Wingo, and Williams was copied on that letter.  It was a --

6    it was, essentially, telling Wingo -- EQT was saying,

7    "Mr. Wingo, you are entered into this agreement with us, and we

8    intend to enforce it to its fullest."

9        And at the same time copied Williams and advised them

10   that, based on this protectable -- protectable legal right that

11   we have that exists outside of the -- in -- well, with --

12   between the two, that if you interfere, then that may draw a

13   tortious interference claim.

14       And so, as here, when the situation -- in order to avoid

15   or attempt to -- to make its deal work when it obviously

16   couldn't, that was, then, where there was the rush to the state

17   court.  And -- and I understand counsel was -- was -- they were

18   frustrated that there was a reference.  There's many writers

19   that go -- go into a brief.

20       There was significant frustration on -- on our side of the

21   table that they had been talking to the chief legal officer for

22   EQT, had been communicating with him.  And even in their motion

23   for the temporary restraining order, it noted that they had had

24   those communications.  And so they had the ability to pick up

25   the phone or text or e-mail and say, "We're going over to the

1    courthouse to present this TRO," and give notice.

2         They, unfortunately, chose not to.  It wasn't a

3    scrivener's error.  They chose not to.  They could have.  And

4    that's why the TRO standing alone is void because they could

5    have given notice.  They didn't.  And even when they recognize

6    they had a problem, they tried to fix it, unfortunately.

7         And sometimes, you know, the -- the fix is worse than the

8    initial harm in that -- excuse me -- in that they went back to

9    the court and said, "There was a scrivener's error.  We told

10   you that we couldn't get in" -- the -- the writing was,

11   essentially, "We couldn't give them notice."

12        That was not true.  But go ahead and enter the TRO

13   anyways.  And then the judge did.  That's -- that's improper.

14        So given the fact that -- that none of these personal

15   jurisdiction -- the issue of the fact that Wingo -- or

16   Williams' unilateral acts were never heard by the state court

17   at all, the state court never had the opportunity to consider

18   any of this because no notice was given.  It could have easily

19   been done and it -- let me grab some water.

20        **THE COURT:**  Lauren, do you have any --

21        **MR. LINCECUM:**  Excuse me.

22        **THE COURT:**  Yeah.  We -- do you need some water?  I think

23   we...

24        **THE DEPUTY COURT CLERK:**  Judge, he's handling it.

25        **THE COURT:**  Oh, he's got one.

 1      **MR. LINCECUM:**  Yeah.  Sorry; I had a dry spot in my

 2  throat.  Excuse me.

 3      So given that situation, you know, just -- just out of the

 4  gate, procedurally, the TRO was defective.  State law says you

 5  can't have it if you don't give notice.  And they could give

 6  notice.  It's not a matter of, We thought about it and we

 7  contemplated it.  It's, You give notice.  I've done it.

 8      I've practiced as long as they have, and you always give

 9  notice of a TRO or you attempt to or you tell the judge,

10  "Judge, I called them, I texted them, I e-mailed them, no

11  response," especially when they're talking to the chief legal

12  officer.  So the TRO is void on that -- on that alone.

13      And then you look at the -- the personal jurisdiction

14  issue.  It doesn't get there.  The -- the contacts, they

15  stopped too short, or -- or I'm not even sure they stopped

16  short.  I'm not even sure the facts ever really existed that

17  they needed to drag EQT into Oklahoma because they were --

18  there would had to have been an affirmative act at -- at

19  affecting Oklahoma that it just doesn't exist.

20      For example, with eBay, where the party there reached out

21  and shut down, through those processes, the auction.  And then

22  you have the -- you know, the other instance where you have the

23  company that's acting -- if -- I'm trying to remember the fact

24  pattern, but they're -- again, they're acting -- they have this

25  active affirmative conduct targeting the forum state.  That's

1    what's missing here.  And that's what -- because, like I said,

2    at first, I read it, and I was like, That's very interesting.

3    Let me go look at the case law.

4        So while -- to answer your question, while the facts vary,

5    there are three consistencies: the affirmative action, the

6    cease-and-desist letter, and the offer, the -- the settlement

7    discussions.

8        The last two without the first one don't make it, and

9    that's what the federal -- or that's what the Tenth Circuit and

10   the Supreme Court case law has said.  That's not enough to --

11   to -- to haul someone out of state into a forum to be -- to

12   litigate there.  They have virtually no presence in Oklahoma,

13   but for the unilateral act of Williams in getting their

14   employee hired from Texas.

15       And, now, so I -- I do want to note Mr. Wingo's role in

16   this and whether or not he's a Texas citizen or he's a Oklahoma

17   citizen.  Mr. Wingo does still have a residence in Texas.  And

18   the declaration that he's -- has now offered the Court to say

19   "I am -- I am an Oklahoma citizen," that's yet to really be

20   determined but, really, is not part of this because his

21   residency is irrelevant.

22       **THE COURT:**  I agree.

23       **MR. LINCECUM:**  So I just want to make sure that when we're

24   addressing the issues, like I did, and I heard the -- Your

25   Honor say earlier it seemed like a strong argument, it did

1  until I read the cases.  Then I was, like, Wow.  That -- that

2  shifted dramatically when you look at that there is nothing

3  else.

4      And that's what the federal courts kept saying is a

5  cease-and-desist letter and -- and discussions -- settlement

6  discussions absent anything else, absent any other affirmative

7  conduct, never meets the Constitutional requirements to

8  establish jur- -- personal jurisdiction over a nonresident.

9      **THE COURT:**  I understand the argument that you're --

10     **MR. LINCECUM:**  Okay.

11     **THE COURT:**  -- making on that --

12     **MR. LINCECUM:**  Good.

13     **THE COURT:**  -- in that regard.

14     I think that your characterization of EQT's letter is a

15  very -- you're walking a very careful line here about what that

16  letter was and wasn't trying to do.  I think that's where

17  the -- I'm going to have to consider the facts and how they

18  mesh with that.

19     But I understand your argument about the actions that

20  Williams took and EQT's professed lack of intent to affect

21  Williams in its home state with the letters -- with the letter

22  and the e-mail and the text messages that were sent.

23     **MR. LINCECUM:**  Good.  Your Honor, now, given the fact

24  that I -- we'd -- I don't think I need to go for that.  The

25  main thing was I just wanted to make sure that you understood

1    that there was another wrinkle there and that -- that, in that

2    context, you have to consider how the conduct originated, who

3    brought it to Oklahoma.  Williams brought it to Oklahoma in

4    their hiring of this out-of-state resident.

5         And the second fact is that there's no other facts other

6    than that communication that avail -- that would pull in EQT

7    into the state of Oklahoma.

8         So given that, I'd like to move to the other issue as to

9    the TRO.  What they were asking the state court to give them

10   was not a -- well, typically, as understood in the TRO, is --

11   is a status quo.  What they acquired from the state court was

12   complete relief.

13        That it voided without any -- any representation

14   whatsoever, voided the provision that exists between EQT and

15   Wingo without ever having any jurisdiction in the state of

16   Oklahoma.  That contract is going to be litigated in federal

17   court in Pennsylvania.  That is not here.

18        What they did was they extended the relief.  Not only did

19   they void something that's not even gone through the -- you

20   know, the -- the Constitutional rights of due process and

21   consideration, they went a step further and then enjoined EQT

22   through that TRO from seeking to enforce it, to seeking legal

23   relief, to going to the court.  That's too much.

24        For example, the case in *Donovan v. Dallas* -- it's 370 --

25   377 U.S. 408 -- says it is not within the power of state courts

1    to bar litigants from filing and prosecuting in personam

2    actions in federal courts.

3         They -- they took that too far.  They didn't --

4         **THE COURT:**  Well, to be fair, it doesn't seem like it

5    stopped you because --

6         **MR. LINCECUM:**  Well --

7         **THE COURT:**  -- EQT, then, filed a case in Pennsylvania.

8         **MR. LINCECUM:**  Well, they -- they had to because, one, it

9    was obvious that Williams -- what was going on was an attempt

10   to interfere -- was exactly what they had feared was, it was

11   Williams' attempt to get this specific employee to build their

12   business and to use his knowledge of EQT, which would --

13   violates the contract to use his knowledge of EQT's business

14   and what he gain -- what he gained there to benefit Williams.

15   That's improper.

16        And so the -- the contract -- all EQT did was continued to

17   pursue its legal rights under that contract and in -- with the

18   forum selection and with the choice of law provisions that

19   provided.  So...

20        **THE COURT:**  Well, I only say that because it seems as if

21   the -- the injunction being granted has done little to inhibit

22   EQT's defense of its legal rights under its contract.

23        **MR. LINCECUM:**  Well, the -- the injunction, one, was too

24   wide.  And I'm not sure that -- that, again, the -- the

25   injunctions are designed to protect the status quo.  And so the

1    question, then, looks to, What is the status quo between

2    Williams and EQT?  Well, there's no relationship between them.

3    So how are you going to protect the status quo?

4        You can't do it by means of injunction -- now -- in a

5    foreign state.  You -- you have to do things differently.  And

6    that's why they didn't want to give notice because they knew if

7    you came in and presented to this judge, they would have been

8    like, "I can't do that for you here."

9        I'm not even sure if I -- you know, sitting in that

10   position -- I know counsel's a judge -- how do you afford

11   relief to someone when there's not even a case or controversy

12   before you?  There's no -- there's no dispute.  They're coming

13   in saying, "Well, the -- we're trying to invalidate the rights

14   in another contract that we're not party to."

15       Well, you can't do that.  How do I give them relief?

16   Mr. Wingo's not here.  He's not standing in front of the judge.

17   So the prospect of -- and of saying -- and my -- my concern

18   here is, at all times, has EQT been respectful of the judicial

19   process and communicated its intent to Williams?  And in that

20   letter said, "If this continues, then we will seek relief in

21   the proper forum and under the -- the correct law."

22       So the essential void injunction was, then, belatedly

23   advised.  In fact, I didn't get a copy of it until we filed a

24   notice of removal in this court.  And then I quickly for --

25   oddly, no sooner than we've submitted the papers to the Court

1    and before the documents hit the docket, all of a sudden, I got

2    an e-mail from counsel.  And so that was curious within itself.

3         But the -- the point is the actions in -- in Pennsylvania

4    were going -- were told that they were going to proceed, and

5    that they were proceeding.  And so the attempt to use a state

6    court to shut down a party from pursuing its legal rights

7    privileged and -- I mean, they had a right to seek legal

8    relief.

9         Talking about Oklahoma law, Oklahoma has the Oklahoma

10   Citizens Protection Act.  And, in fact, it might even put down

11   the type of claim that they have because you cannot sue

12   somebody to keep them from petitioning the Gov- -- the -- the

13   Government, whether it's in a lawsuit or elsewhere.  So...

14       THE COURT:  Well, for my purposes, one of the things that

15   I have to weigh is, you know, will the threatened injury to

16   Williams outweigh the harm an injunction will cause EQT?  And

17   it appears to me like there has been limited harm to EQT based

18   on the fact that you are in Pennsylvania defending your -- I

19   mean, I'm not faulting you for it.  I'm just saying it seems to

20   me that you've got another process moving forward by which you

21   intend to --

22       MR. LINCECUM:  Right.

23       THE COURT:  -- resolve your issues with Mr. Wingo, and

24   you've got that process going on as well, so I'm having to ask

25   myself what is the -- in terms of weighing whether or not to

1  vacate or to extend the TRO, what is the harm here to -- would

2  it -- to EQT in this process if --

3      MR. LINCECUM:  Right.

4      THE COURT:  -- this is continued for another 10 or 14

5  days?

6      MR. LINCECUM:  Yeah.  And -- and, Your Honor, I think the

7  focus -- and I -- and I want to, as I'm mentioning this, think

8  about what you're asking me just a moment.  The irreparab- --

9  the -- the standard that they have to meet is to demonstrate to

10 this Court and to the state court, when they were there, that

11 they are going to suffer irreparable harm.

12      And their position from -- if I -- I'm -- I want to make

13 sure I don't misquote it, but their position is we're not going

14 to get to have this human resource that we wanted for sometime.

15      Doesn't mean they'll never have him.  It just means that,

16 because of the contract, they might not can have him if the law

17 stands as it should in Pennsylvania and pursuant to that -- if

18 that agreement's enforceable.

19      So the irreparable harm is just like we've seen with the

20 univer- -- you know, our own universities lately.  When they

21 lose a president, they go on a hunt for the next president.  It

22 doesn't mean the university shuts down, that it stops doing

23 business, that students stop enrolling.  And for Williams, it's

24 no different.

25      It doesn't mean that their company's going to stop because

1    they have to wait on or -- or find a substitute to fill this

2    role.  Williams, as he said, is -- is -- it's very reputable

3    company.  It will continue to sell products.  It will continue

4    to -- to do its core business without any harm whatsoever, and

5    they haven't shown any.

6        Their harm is that, We might not get the preferred

7    employee that we want.  That's not -- that's not irreparable

8    harm.

9        If it was demonstrated -- if the Pennsylvania Court, for

10   example, enforces the agreement and then it's attempted to be

11   enforced in the state of Oklahoma, then that's the time for

12   when the -- Oklahoma has to decide can it recognize another

13   court's -- or another state's law and agreement that was made

14   outside of Oklahoma, given its public policy?

15       **THE COURT:**  Uh-huh.

16       **MR. LINCECUM:**  So their conflict is they're trying --

17   they're -- they're too far ahead of the cart.  Their conflict

18   is for another day.  They -- it's not even -- it's not even at

19   issue for them yet because they don't have a contract that

20   we're interfering with at all.  We're seeking -- and if -- even

21   if you assume, Well, they hired him, so they have an employment

22   agreement, well, that comes second to our agreement, so we

23   enforce ours first.

24       So getting back to your question of what harm does EQT

25   suffer?  I think that's where it becomes immeasurable.  And --

1  and I've given this thought more than just the few minutes that

2  I've been talking about the other stuff.

3      My concern -- and this has been something that's gone on

4  since Oklahoma adopted the policy that it wasn't going to

5  recognize any of these covenants -- is how do we effect harmony

6  between the states when any contract that's legal in another

7  state, in another forum, merely because they pull either

8  employee or employer into Oklahoma, now Oklahoma is going to

9  essentially have an -- a nationwide prohibition against the

10  covenants in other states under other state's law?

11      You heard counsel say only -- Oklahoma's like four states.

12  So the -- the big problem, the irreparable harm is, if that's

13  true, then Oklahoma law stepping in and invalidating the laws

14  of the other states who say that we're okay with reasonable

15  restrictions on employment, that's way too broad.

16      And so when you're looking at reparable harm, there's no

17  way to recover from that because if that -- if that is true

18  here, that means that every contract that any employer makes or

19  employee makes --

20      **THE COURT:**  I think this is --

21      **MR. LINCECUM:**  -- then gets pulled in.

22      **THE COURT:**  -- this is all very relevant to the Oklahoma

23  legislature.

24      I think it's maybe --

25      **MR. LINCECUM:**  Right.

1    THE COURT:  -- less relevant to me.

2    I think --

3    MR. LINCECUM:  Right.

4    THE COURT:  -- my concern is what is the harm to EQT in

5    this particular --

6    MR. LINCECUM:  Yeah.

7    THE COURT:  -- circumstance?

8    MR. LINCECUM:  EQT is it loses its -- its right to protect

9    its trade secrets, its -- the confidential information of its

10   company.  It renders it absolutely without resource to protect

11   itself.

12   THE COURT:  Okay.  That reminds me of the question I had

13   earlier.

14   MR. LINCECUM:  Okay.

15   THE COURT:  So there are basically three different types

16   of protections that are involved in that severance agreement.

17   One of them is the noncompete.  One of them is the, I won't go

18   put your clients -- whatever that phrase is --

19   MR. LINCECUM:  Right.

20   THE COURT:  -- bit.

21   And then there's the nondisclosure bit; right?  So there

22   is three different parts of it.  As I understand it, Williams

23   is asking to enjoin the noncompete and -- oh, what is that

24   phrase?

25   MR. LINCECUM:  Is it non-solicitation?

1          THE COURT:  Yes, that one.

2          MR. LINCECUM:  Sure.

3          THE COURT:  -- those two sections, but not the section

4    regarding nondisclosure, that that's -- they're not challenging

5    that part of the agreement or they're not saying that they

6    think that Oklahoma law frees them from that section.

7          Is that your understanding as well?

8          MR. LINCECUM:  Well, I -- I think that my understanding is

9    they're not free from any of it because if -- if the agreement

10   between EQT and Wingo includes all three covenants --

11         THE COURT:  Right.  But they're not even seeking, right --

12         MR. LINCECUM:  Right.

13         THE COURT:  -- that as to --

14         MR. LINCECUM:  Right.

15         THE COURT:  -- nondisclosure?

16         I understand that Williams isn't asking.

17         MR. LINCECUM:  Right.

18         THE COURT:  They're not -- their request for an injunction

19   did not say that it wants any relief from that nondisclosure

20   provision, so --

21         MR. LINCECUM:  Right.

22         THE COURT:  -- I don't see them as even challenging that.

23         Is that --

24         MR. LINCECUM:  Right.

25         THE COURT:  Is that your read of --

1              **MR. LINCECUM:**  And --

2              **THE COURT:**  -- that as well?

3              **MR. LINCECUM:**  And -- and I -- I think that's because

4   they -- it would make them look bad if they did because the

5   reality is this employee that's coming from -- that this

6   high-level employee with EQT is coming to Williams, there's no

7   way to police that.

8              If they say we're -- you know, we're -- we're -- we're not

9   wanting to offend the disclosure; we're not going to ask him

10  about anything; we're just wanting him to do what we hired him

11  to do and -- and do it with the information that he has in his

12  head -- which is put there by EQT.  And that's why the

13  reasonableness of the restrictions are important because you

14  cannot prevent somebody -- essentially, the compensation aspect

15  of the employment arrangement compensates them for some

16  security to the company after they leave, that they're not just

17  going to steal everything and go give it to someone else.

18             And I think there's a reason why Williams wants -- that

19  they want Mr. Wingo.  It's not because he didn't work for EQT.

20  He did.  And -- and EQT is what it is in the Appalachian Basin.

21  So they're pulling him over, pulling all that information with

22  him.  At the same time going, No, we're not going to ask him

23  about disclosure, but we want to get rid of these other two

24  things where he can run free.

25             And that's not acceptable.  That -- that kills EQT and any

 1   company's ability to protect itself at all.  Now, Oklahoma

 2   makes its legislative decision, yes, but can't -- here, we're

 3   now trying to transplant that and invalidate enforceable

 4   provisions that are controlled by a different state's law in a

 5   different forum, merely because of a letter that was copied to

 6   Williams saying, "You can't do that."

 7        THE COURT:  Okay.

 8        MR. LINCECUM:  Not because of any other acts, it believes.

 9        THE COURT:  Okay.  So I hear you saying that although --

10   the harm has to do that -- that EQT will suffer is the harm

11   that will befall you if Mr. Wingo uses his skills and

12   experience on behalf of Williams, and that you have that fear

13   regardless of whether nondisclosure is part of the relief that

14   Williams is seeking.  Is that a fair summation of what you've

15   just said?

16        MR. LINCECUM:  Yes, ma'am.  And, in fact --

17        THE COURT:  Okay.

18        MR. LINCECUM:  -- it's -- it's customarily a provision in

19   those contracts.

20        It says that the parties recognize that a breach of these

21   covenants is irreparable because of the inability to go through

22   and find the dollar amount that it's worth because once the

23   information's out -- for example, if Coke's information -- its

24   formula was released on the Internet, anybody could go make it.

25        THE COURT:  Okay.

1    **MR. LINCECUM:**  So you can't -- and that's the same thing

2    here is EQT is trying to protect its formula and did so under

3    the applicable and legal rights it had, and then Oklahoma's

4    trying to release it to the world.

5    **THE COURT:**  You represent in your -- in your filing, I

6    think, that Mr. Wingo is not anticipated to begin work at

7    Williams until something like two weeks, maybe the 14th or

8    some -- some date like that into --

9    **MR. LINCECUM:**  July 14th.

10   **THE COURT:**  -- well into July.

11   **MR. LINCECUM:**  Right.

12   **THE COURT:**  And that he hasn't started working for

13   Williams yet.  Is that still, on your information and belief,

14   correct?

15   **MR. LINCECUM:**  That -- that is my understanding.  I've

16   been given no different --

17   **THE COURT:**  Okay.

18   **MR. LINCECUM:**  -- information at the time.

19   In fact, you know, my ult- -- my further understanding is

20   that he was employed -- he was our employee up to the time

21   that, I believe, they file -- I have to go make sure.  I'm not

22   going to say that.  My thought was that he was employed at the

23   time the lawsuit was filed.  That may -- that may not be true.

24   But, absolutely, my understanding is that he doesn't go to

25   work for Williams until the 14th, which also creates another

1    issue for the TRO as he's -- he's not even there yet.  The --

2    the issue -- the controversy has not even got there.  He's --

3    he's -- he hasn't showed up for the first day at work.

4        So to -- to apply that so broadly in the TRO, not --

5    notwithstanding all of the facts that weigh against the TRO

6    from the lack of notice, from the lack of personal

7    jurisdiction, from the lack of irreparable harm, and the fact

8    that money damage would compensate them if, for example, they

9    had to -- I'll just give a real quick example.

10        If Williams had to go and get a headhunter to go find

11    someone else to hold a temporary position until Mr. Wingo could

12    get there, that would be a compensable item if it was

13    determined that -- somehow that EQT was doing something

14    unlawful by seeking to enforce its agreement.  So that is a

15    compensable amount of money.

16        They could find somewhere -- I mean, I can easily be

17    replaced by someone better or worse.  They can easily find

18    someone better than their preferred employee.  It might just

19    cost more.  That means it's compensable.  And so when you look

20    at that situation, just like with Oklahoma State when they had

21    to find a new president, the search to find someone to sit in

22    that seat is -- is -- is -- you can put a dollar amount on it.

23        I've had experts testify to similar things.  And if you

24    can assign a dollar value to it, then it's compensable money

25    and a TRO cannot issue.  And here, Williams cannot show that

1   it's going to lose a dime because it was doing amazing before

2   they thought about going to Texas and hiring Mr. Wingo, and

3   it's probably going to continue to be amazing.

4         **THE COURT:**  They'd probably stipulate to that, actually.

5         **MR. LINCECUM:**  Right.

6         **THE COURT:**  All right.

7         **MR. LINCECUM:**  And so, Your Honor, with that said, I

8   believe if -- and unless you have any other questions.  You

9   know, just in summary, and -- and to close is our -- the

10  personal jurisdiction position -- EQT's position is that there

11  is -- that these con- -- these contacts that they're citing are

12  not enough under the Tenth Circuit law, the -- the Supreme

13  Court law.

14        And when you read the cases -- and that's what was the

15  difference for me in just reading their brief.  When you read

16  the cases, you get clarity.  And the clarity is the -- the

17  communication regardless -- cease-and-decease letter, we're

18  going to enforce our rights, the advice just like the -- the

19  infringement letters, and then the subsequent communications

20  about settlement, that's not enough.  That package is not

21  enough.

22        There has to be an affirmative act directed towards the

23  forum, like the eBay situation.  And then there was some

24  other -- I still can't recall the facts, but there's -- it's

25  where the auction was shut down.  So if, for example, Williams

 1    was engaging in a search of an employee -- or to find employees

 2    and we sought to shut that down, that's an affirmative action.

 3    That didn't happen.

 4        So part 1, without more, they don't get their own personal

 5    jurisdiction, which means TRO, despite its fatal defects, can't

 6    get there because personal jurisdiction never can be formed.

 7        And that's in close.

 8        **THE COURT:**  Okay.  Thank you.

 9        **MR. LINCECUM:**  Thank you, Judge.

10        **THE COURT:**  Mr. Wilkes?

11        **MR. WILKES:**  Thank you, Your Honor.

12        It appears EQT wants to be the only entity that is allowed

13    to have an exception to the public policy of Oklahoma.

14    Regardless of where the -- a contract or term or provision in a

15    employee handbook discusses noncompetition, regardless where it

16    originated, they're not enforceable in this state.

17        That, not being enforced in this state, doesn't make it a

18    nationwide injunction, although that's a fun catchphrase from

19    recent news.  It only precludes EQT from interfering with the

20    Williams Companies -- who we'll stipulate is amazing and will

21    keep doing amazing -- but to keep them from interfering with

22    the Williams Companies' business here in Oklahoma and its

23    contractual rights.

24        There's some points I wanted to -- to address.  We keep

25    talking about this -- this -- this contract.  I mean, it was a

1    plan.  And the agreement itself, which EQT drafted, states that

2    it's not a contract.  EQT wanted to have its cake and eat it

3    too.

4         It wanted to be able to set out forms and restrictions,

5    yet not be held accountable to it under a breach of contract

6    against EQT but it can, in turn, try to enforce it against

7    someone else.  And Mr. Wingo never received benefits under this

8    plan.

9         This was not -- as the Court noted -- not a simple, "Hey,

10   here's a notice of our rights letter."

11        This was a letter that was copied to Williams but very

12   intentionally, within the body of it, it directed threats

13   against Williams and its personnel that it was going to bring a

14   lawsuit against it and them, and then it would also seek a

15   temporary restraining order against Williams or Wingo.  It's

16   not specific in that regard.  It's not a, "Here's a notice of

17   our contract.  Please govern yourself accordingly."

18        It's like, "No, we're going to file a lawsuit against you,

19   Williams Companies, and against your employees, and then we're

20   also going to get emergency relief and get a temporary

21   restraining order.  And we're giving you a 2:00 p.m. hard

22   deadline 'cause our legal team's waiting in the wings to take

23   action if you don't accept our terms on how you're going to --

24   that you're going to follow and -- our dictated conduct that

25   we're -- our conduct that we're dictating for you in the state

1    of Oklahoma."

2          With regard to activities, well, one, Williams didn't go

3    down to Texas and -- and get Mr. Wingo.  Mr. Wingo was

4    identified through a third party -- third party in a nationwide

5    search as a potential candidate, and he came here.

6          We did not have to wait for EQT to violate Oklahoma law;

7    hence, the petition -- the complaint seeking declaratory

8    judgment.  Injunctive relief was to prevent the harms and to

9    clarify the rights of the parties.

10         **THE COURT:**  Mr. Wilkes, what is Mr. Wingo's status with

11   Williams?

12         **MR. WILKES:**  He has completed all of his onboarding

13   with the -- Wingo -- I'm not sure of when he sits behind his

14   desk, but I know that he's --

15         **THE COURT:**  There's a contract, an agreement of some kind,

16   between Williams and Mr. Wingo?

17         **MR. WILKES:**  And -- right.  And --

18         **THE COURT:**  Okay.

19         **MR. WILKES:**  And it -- he has reported to Williams and

20   gone through all the onboarding paperwork, filled the documents

21   and -- and the usual things that we do as new employees.  But

22   that's -- that's my understanding.

23         **THE COURT:**  Okay.

24         **MR. WILKES:**  Plaintiff counsel -- there were a lot of

25   suppositions, a lot of fictitious conversations going by -- on

1  by Williams, "aha" moments.  "Oh, good.  They sent us a letter

2  threatening to sue us, and now we have to spend thousands of

3  dollars on lawyers."

4      That -- that, obviously, didn't happen.

5      EQT did much more than send a letter.  EQT picked a fight

6  with Williams in Oklahoma and continued along that.  And it

7  threatened.  It made deliberate acts pointed at Williams in

8  Oklahoma.

9      Plaintiff, of course, referenced within the plan, there's

10 an arbitration clause.  And I don't know the inference that

11 we -- that somehow Williams should have followed an arbitration

12 clause in a contract between EQT and Mr. Wingo, but I note that

13 EQT certainly hasn't followed its own plan because it filed a

14 lawsuit in federal court in Pennsylvania.

15     It did not trigger its own arbitration clause.  So we --

16 this simply -- the arbitration clause in a contract between

17 other parties has no impact on Williams and, apparently, it's

18 not honored by EQT either with respect to its conduct as to

19 Mr. Williams [sic].

20     With respect to the -- EQT sent that e-mail directly to

21 Williams.  And the discussion that either Supreme Court in

22 Tenth Circuit case that shows that -- that this all simply is

23 enough, well, if that were true, we -- this hearing would have

24 been rather short and we would have -- and perhaps the Court

25 wouldn't have even had a hearing on it if there was applicable

1    Supreme Court case law that -- that said that these threats and

2    these -- these actions taken by EQT were not enough to

3    establish specific personal jurisdiction.  That's simply not

4    true.

5        I do note that he's -- Mist- -- counsel spent some time

6    talking about the *Red Wing Shoe* case and how it was commented

7    on by the Tenth Circuit.  What's important to note, Your Honor,

8    is that *Red Wing Shoe* case came out of the Federal Circuit.

9        The Federal Circuit in the cases that I discussed earlier,

10   *Tremble*, 997 F.3d 1147 Fed. Cir. of Court of Appeals 2021 --

11   the Circuit Court noted that other Courts had been

12   misinterpreting *Red Wing* -- *Red Wing* -- the *Red Wing* case and

13   then clarified its position that there is no general rule that

14   demand letters can never create specific jurisdiction.

15       And that's *Tremble*, 997 F.3d 1156.  It followed again the

16   next year in 2022 with the *Apple Inc. versus Zipit Wireless*

17   case where it once again quoted itself and said, "We made it

18   clear last year that there's no general rule that demand

19   letters can never create specific personal jurisdiction."

20       The Federal Circuit Court of Appeals was the author of *Red*

21   *Wing*, so other Courts interpreting what *Red Wing* said or meant

22   to say in between the issuance of *Tremble* -- *Tremble* and *Zipit*

23   are simply wrong.  And the Federal Circuit Court of Appeals

24   made that clear in its opinion.  We see that all the time from

25   the U.S. Supreme Court where it says the -- that Circuit Courts

1    have misinterpreted our earlier decision and, now, we're going

2    to clarify it.

3         Well, it was clarified.

4         The -- the temporary restraining order kept EQT from

5    interfering with Williams' right to be free of EQT's tortious

6    interference with its contractual and business relations

7    regarding -- and we did not have to wait for them to -- for EQT

8    to -- to pull the trigger on filing a lawsuit or taking further

9    action against Williams, as it threatened to do.

10        Like the couple in Colorado, after receiving an e-mail

11   from the folks in Connecticut that threatened litigation, they

12   took the appropriate step and -- and -- and filed for

13   injunctive relief and a declaratory judgment with the Court in

14   Colorado to seek a clarification of the rights of the parties.

15        And -- and so such -- that's the -- the damage issue,

16   again, I addressed the fact that, yes, we can put a dollar

17   value on what it would cost to hire an outside vendor to do a

18   nationwide search.  You have to pay them under the contract.

19        But what you can't put a dollar value on is having,

20   arguably, one of the top three positions in a $70 billion

21   corporation sit empty, a person who has extreme amount of

22   responsibilities.  And to have that sit empty for an untold

23   period would have a deleterious impact on the Williams

24   Companies.

25        There is, as the Court noted, this idea that, "Ah, we'll

1  just" -- that counsel said, "Ah, we'll just go for these two

2  and then we can get away with the other," it's made up.  We do

3  not dispute -- and no one disputes or is trying to challenge

4  the applicabil- -- applicability of the confidentiality and

5  trade secrets issue.

6       We don't seek to avoid confidentiality violations or -- or

7  to have that rendered moot or trade secrets.  In fact, in the

8  negotiations between the parties, it was never a problem that

9  Mr. Wingo would be walled off from anything that had to do with

10  EQT.

11       There's no allegations that Mr. Wingo has done anything

12  wrong except accept a job in Oklahoma and move to Oklahoma to

13  begin working for an Oklahoma company.  That's -- that's not

14  wrong in Oklahoma.  And Oklahoma law applies here in this

15  dispute between an Oklahoma corporation and EQT.

16       Thank you.

17       **THE COURT:**  Thank you.

18       **MR. LINCECUM:**  Your Honor, I don't know if you would allow

19  me but just in one thing that wasn't part of the discussions

20  that came up, I'd like just -- just a brief moment to -- to

21  comment on the arbitration issue.

22       **THE COURT:**  Sure.

23       **MR. LINCECUM:**  Okay.  Your Honor, the importance of

24  reading the underlying documents is what's being missing --

25  missing out on these briefs.  The issue, for example, that EQT

1  is not following its own contract is not true.

2       When you -- and I would just defer to the contract itself.

3  It has the right to proceed on injunctive relief and then seek

4  arbitration.  So I just could not leave the flavor that --

5  again, that something is as it appears when it's not.

6       And that's the only thing I would like to add.

7       **THE COURT:**  Okay.

8       All right.  I think I have heard all I can absorb to this

9  point about this topic.  And I understand that the injunction

10  will expire tomorrow, and we will get something out

11  expeditiously in this case.

12      Anything further from the parties?

13      **MR. WILKES:**  Thank you, Your Honor.

14      **MR. BROUSSARD:**  No, Your Honor.  Thank you.

15      **MR. LINCECUM:**  No, Your Honor.

16      **THE COURT:**  All right.

17  We'll be adjourned.

18      **CSO:**  All rise.

19           *(Proceedings adjourned at 1:18 p.m.)*

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATION**

2            I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

3    TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5

6            CERTIFIED:        *s/Leslie K. Ruiz*
                               Leslie K. Ruiz, OK-CSR, RMR
7                              United States Court Reporter
                               333 W. 4th Street, Room 411
8                              Tulsa, OK  74103
                               (918) 699-4794
9                              leslie_ruiz@oknd.uscourts.gov

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25